# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Halo Branded Solutions, Inc., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No: 15 C 50152 |
| | ) | |
| RTB West, Inc., | ) | |
| | ) | |
| *Defendant*. | ) | Judge Frederick J. Kapala |

## ORDER

Defendant's motion to dismiss [15] is granted in part and denied in part. Should plaintiff elect to proceed on a rejection theory of recovery for its breach of contract claim, it is granted leave to filed an amended complaint within 21 days.

## STATEMENT

Plaintiff, Halo Branded Solutions, Inc. ("Halo"), has filed a four-count complaint against defendant, RTB West, Inc. ("RTB") in connection with a sale of goods subject to the Illinois Uniform Commercial Code ("U.C.C."), 810 ILCS 5/2-101, et seq. This court has diversity of citizenship subject matter jurisdiction. See 28 U.S.C. § 1332(a)(1). For the following reasons, defendant's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss is granted in part and denied in part.

## I. ALLEGATIONS

According to the complaint, in 2012 Halo and RTB engaged in negotiations for prepackaged new patient welcome kits ("kits") consisting of a capsule pill holder, a micro bead pillow, a duffle bag, a fleece throw blanket, and a set of stereo earphones that RTB knew were for one of Halo's healthcare provider clients. Halo stressed the need for the products to be free of contaminants because the kits were intended for direct distribution to dialysis patients who have an increased susceptibility to infection. Halo informed RTB that it was relying on RTB's expertise that all applicable testing would be done to make sure the products were safe for delivery to the new patients. RTB promised that all the products would be adequately tested and would be free of harmful contaminants.

In December 2012, Halo issued a purchase order for 60,000 kits which provided that RTB would have a third party conduct FDA safety testing on the pill holders as well as safety testing on all the products. After reviewing preproduction samples for quality and safety, Halo approved production for three deliveries: 15,000 kits directly to Halo's client by mid-April 2013; 15,000 kits to a distribution company by June 2013; and 15,000 kits each to Halo's warehouse in September and

December 2013, respectively.[1] RTB packaged the pillow, blanket, pill holder, and earphones separately in plastic and then inserted each item into the duffle bag, which was then also wrapped in plastic as a complete kit. The kits were put into boxes, shrink wrapped, and shipped. Upon each delivery, the kits were inspected to the extent possible in light of the prepackaging. No obvious deficiencies were noted.

In December 2013, Halo's client reported mold or dirt on some of the blankets and bags and a strange smell emanating from the kits when they were opened. Halo informed RTB about these reports. Halo re-inspected the remaining kits and found a large number to have a white mildew-like substance and dirt on them. Halo also discovered that some blankets had green stains and a garden-like smell. None of the preproduction samples had these issues. Halo and its client had samples of the kit items tested which indicated contamination with silica, grease, dirt, and mold. Accordingly, the blankets and bags were not contaminate-free or safe for distribution to patients and Halo's client refused delivery of the contaminated blankets and bags.

Halo paid RTB in excess of $120,000 for the defective goods. Despite being informed of the defects and acknowledging that it was responsible for the silica, grease, and dirt, RTB failed and refused to replace any of the defective items. Halo has had to credit its client for the full amount of the defective kits so that substitute goods could be obtained.

In Count I, styled "breach of express warranty," Halo alleges that RTB warranted that the kits passed the requisite safety standard, were in good condition, and were safe for delivery to new dialysis patients. RTB breached this express warranty because the kits were contaminated with silica, grease, dirt, and mold. Halo also alleges that it notified RTB of the deficiencies within a reasonable time after discovery of the latent defects.

In Count II, styled "breach of warranty of merchantibility," Halo alleges that RTB was and is in the business of selling prepackaged welcome kits. The kits were not of the same quality as those generally accepted in the industry, were not fit for the ordinary purposes for which such goods are used, and did not conform to the quality established by the parties' prior dealings or by usage of trade. Halo notified RTB within a reasonable time after discovery of the latent defects. RTB refused to repair or replace any of the goods or refund any money.

In Count III, styled "breach of implied warranty of fitness for a particular purpose," Halo alleges that at the time of the purchase, RTB knew or had reason to know that Halo intended to use the kits for the particular purpose of giving them to new patients and that they needed to be in a sterile condition. At the time of the purchase, RTB knew or had reason to know that Halo was relying on RTB's skill and judgment to select and furnish kits for that purpose. Halo justifiably relied on RTB's skill and judgment to provide uncontaminated kits. The kits were not, however, fit for that particular purpose because they were contaminated with silica, grease, dirt, and mold.

In Count IV, styled "breach of contract," Halo alleges that it entered into a written contract with RTB for the purchase and delivery of the kits. Halo did all, or substantially all, of the significant things that the contract required of it or, alternatively, was excused from doing those

---

[1]An invoice attached as Exhibit A to RTB's responsive memorandum shows that all 60,000 kits were delivered to Halo or its client in June 2013.

things. All the conditions required by the contract for RTB's performance occurred. RTB failed to deliver the kits in a safe and contamination-free state as required by the parties' contract.

## II. ANALYSIS

When deciding a defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court accepts all of the well-pleaded allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Killingsworth v. HSBC Bank Nev., N.A., 507 F.3d 614, 618 (7th Cir. 2007). To state a claim under the Federal Rules, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true . . . state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted).

### A. Breach of Contract (Count IV)

RTB argues that, to the extent Halo seeks damages under §§ 2-711, 2-713, or 2-715, its breach of contract claim in Count IV fails because Halo has not alleged that it gave RTB notice of rejection, see 810 ILCS 5/2-601 & 2-602, or notice of revocation of acceptance, see id. 5/2-608, within a reasonable time after it discovered or should have discovered the grounds for rejection or revocation of acceptance. Instead, according to RTB, Halo has alleged that it "informed RTB about" its client's reports of a smell, dirt, and mold on some of the kits, but does not allege that it ever indicated that it rejected or did not wish to retain the kits. Thus, RTB concludes that the breach of contract claim must be dismissed.

In response, Halo contends that paragraphs 17, 20, 24, and 37 of its complaint read together plainly allege that Halo revoked its acceptance of or rejected the kits:

> 17. In or about December 2013, HALO's client reported what appeared to be mold or dirt on some of the blankets and bags with a strange smell emanating from the kits when they were opened. HALO informed RTB about these reports.
>
> . . . .
>
> 20. HALO and its client both had samples of these items sent out to for [sic] testing. The results of this testing indicated that the items were contaminated with silica, grease, dirt, and mold.
>
> . . . .
>
> 24. In connection with the purchase order, a copy of which is attached as Exhibit A, HALO paid RTB in excess of $120,000 for the defective goods. Despite being informed of the defects with the prepackaged welcome bags delivered and acknowledging that it was responsible for the silica, grease and dirt, RTB has failed and refused to replace any of the defective items.
>
> . . . .
>
> 37. HALO took reasonable steps to notify and did notify RTB within a reasonable time after discovery of the latent defects that the prepackaged welcome

bags did not conform to the quality of goods stated or expected. RTB refused to repair or replace any of the defective and contaminated goods or refund any of Plaintiff's money used to pay for these items.

Apparently, Halo is pleading both a rejection of goods and also revocation of acceptance. As for rejection, "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest." 810 ILCS 5/2-601. "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." 810 ILCS 5/2-602(1).

The only notice alleged in the complaint is after the odor, dirt, and mold was detected by Halo's client in December 2013. While the complaint references the various delivery dates stated in the purchase order, there are no allegations as to when RTB actually delivered the kits. Moreover, RTB claims that all the kits were delivered by June 9, 2013, and has attached its invoice purporting to demonstrate that fact. Under these allegations in the complaint it is not possible to determine how long after delivery and inspection the purported notice of rejection occurred. Thus, the court cannot conclude that Halo has plausibly alleged seasonable notice of rejection of the kits in whole or in part. Consequently, Count IV is dismissed inasmuch as it alleges rejection. If Halo intends to proceed under the rejection theory, it is granted leave to file an amended complaint remedying this deficiency.

As for revocation of acceptance, the U.C.C. provides:

§ 2-608. Revocation of Acceptance in Whole or in Part.

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

810 ILCS 5/2-608. Viewing the factual allegations of the complaint in the light most favorable to Halo, the allegation that the odor, dirt, and mold was detected in December 2013, then confirmed through testing, and reported to RTB is a plausible allegation of revocation of acceptance within a reasonable time after discovery of the contamination. The court arrives at this conclusion in view of the fact that the kits were individually packaged and apparently only inspected from the outside without opening the kits. See 810 ILCS 5/2-608(1)(b). RTB argues further that the allegations emphasized by Halo do not show that it ever put RTB on notice that it was claiming the right to

4

return all the disputed goods. Instead, the allegations can be read only to suggest that Halo may have attempted to return or be refunded for some of the goods. RTB does not explain, however, why Halo cannot revoke acceptance of only the contaminated kits if that was its intent. For these reasons, the court rejects RTB's contention that Halo failed to state a claim for breach of contract in Count IV under the revocation-of-acceptance theory of recovery.

### B. Breach-of-Warranty Claims (Counts I-III)

RTB argues that the breach-of-warranty claims in Counts I through III are barred by Halo's failure to allege timely notice as required by the U.C.C. which provides that "[w]here a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." 810 ILCS 5/2-607(3)(a). "The notice requirement serves to provide a seller an opportunity to cure a defect and minimize damages, protect his ability to investigate a breach and gather evidence, and to encourage negotiation and settlement." Maldonado v. Creative Woodworking Concepts, Inc., 296 Ill. App. 3d 935, 939 (1998) (citations omitted).

Halo maintains that it has adequately pleaded that it notified RTB within a reasonable time through its allegation that in "December 2013, HALO's client reported what appeared to be mold or dirt on some of the blankets and bags with a strange smell emanating from the kits when they were opened. HALO informed RTB about these reports." RTB argues that there is no allegation of timely notice because Halo does not allege when this purported notice occurred or allege how notice was given, to whom, and by whom.

While there is no specific date alleged, clearly the notice followed Halo's client's complaints about the contamination in December 2013 and sometime before the complaint was filed in this case in July 2015. Even if the notice upon RTB occurred a day before the complaint was filed, this 15-month delay is still a plausible allegation of reasonable notice for pleading purposes. Compare id. at 941 (holding that "waiting over 11 months was not necessarily unreasonable") with Wagmeister v. A. H. Robins Co., 64 Ill. App. 3d 964, 967 (1978) (holding that under the circumstances an allegation of a 30-month delay was not an allegation of reasonable notice of a defect as a matter of law). Moreover, the precise date of notice is of diminished importance in light of the specific assertion by Halo that RTB in fact received the notice and acknowledged responsibility, yet refused to repair, replace, or refund because this is an allegation that the purpose of § 2-607(3)(a) was served. This is not to say that it will ultimately be determined that Halo complied with § 2-607(3)(a). Rather, the issues concerning whether notice was given within a reasonable time after discovery of the defects are fact-bound because it is not clear when the respective deliveries were made or how the latency of the defects affects the discovery issue. Consequently, these questions will be resolved once discovery has been completed and there is evidence on the record, but they do not amount to pleading defects. See Maldonado, 296 Ill. App. 3d at 940 ("Whether sufficient notice has been provided is generally a question of fact to be determined based upon the particular circumstances of each case.").

As for the "by whom and to whom" argument, the allegation is that Halo informed RTB about its client's reports of dirt on the blankets and so forth. RTB has not convinced the court that identifying the representative of the respective corporations who sent and received the notice is required to make the allegation plausible. The court is also unconvinced that the precise means of

5

the notice (email, telephone call, letter, etc.) has to be pleaded where, as here, there is a specific allegation that RTB acknowledged responsibility for the reported defect but did not replace, repair, or refund. The court must construe the allegations in the complaint in the light most favorable to Halo and, therefore, finds that Counts I through III contain sufficient allegations of reasonable notice to state breach of warranty claims under the applicable plausibility standard.

RTB also argues that the breach-of-warranty claims in Counts I through III fail because Halo failed to allege that the goods were not as warranted at the time of delivery. In fact, RTB contends that Halo has pleaded itself out of court by alleging the opposite in asserting that it inspected the kits and noted no obvious deficiencies. In response, Halo argues that it has alleged that the defects were present at the time of delivery, but that its inspections upon delivery did not reveal the defects because they were latent. RTB then takes issue with the allegation that the defects were latent; arguing that visible dirt and mold, as well as the odor could have been easily discovered upon inspection.

Claims for breach of implied warranties may be maintained even where the buyer inspected the goods upon delivery when based on latent defects. See Anderson v. Gulf Stream Coach, Inc., 662 F.3d 775, 784 (7th Cir. 2011). The court agrees that Halo has sufficiently pleaded that the kits were defective upon delivery, but that the defects were not discovered even though the kits were "inspected to the extent possible in light of the prepackaged manner in which the products were intended for delivery to Halo's clients." In light of the allegation that the items with dirt, mold, and an odor were individually wrapped in plastic and then put into a duffle bag which was also wrapped in plastic –presumably because Halo's client's patients would prefer receiving the kits in that condition– it is a reasonable inference that the defects were latent upon visual inspection. While it may turn out that this was not so, or that the inspection was lacking–perhaps, for example, a limited amount of kits should have been randomly opened for inspection–and Halo should have discovered the defects upon delivery, there are sufficient allegations that the kits were defective upon delivery for pleading purposes.

Next, RTB argues that in Count III Halo fails to allege the existence of an implied warranty of fitness for a particular purpose because Halo did not rely on RTB to select the goods, but instead included precise specifications in its purchase order. Alternatively, RTB argues that even if such a warranty existed, Halo disclaimed it by approving a pre-production sample kit.

To state a claim for breach of the implied warranty of fitness for a particular purpose, a plaintiff must allege that "(1) the seller had reason to know of the particular purpose for which the buyer required the goods; (2) the buyer relied on the seller's skill and judgment to select suitable goods; and (3) the seller knew of the buyer's reliance on its skill and judgment." In re McDonald's French Fries Litig., 503 F. Supp. 2d 953, 957 (N.D. Ill. 2007) (quotation marks omitted). Halo has specifically alleged that "[a]t the time of the purchase, RTB knew or had reason to know that HALO was relying on RTB's skill and judgment to select and furnish prepackaged welcome bags for the purpose of having those welcome bags given to new patients of HALO's healthcare provider client." That the purchase order also included specifications for the various components of the kits does not contradict this allegation.

The case cited by RTB, Mandel Metals, Inc. v. Walker Group Holdings, is distinguishable because the buyer in that case ordered aluminum of a specified thickness that the seller knew the

buyer would use to build tankers, but there was no allegation that the buyer relied on the seller's skill and judgment to select the aluminum. No. 14 CV 8493, 2015 WL 3962005, at *2 (N.D. Ill. June 26, 2015). In contrast, in this case Halo has alleged that RTB knew that the kits were for the specific purpose of serving as welcoming gifts for dialysis patients and was relying on RTB's skill and judgment to select contaminant-free items for the kits. There is nothing inconsistent about alleging reliance on RTB to use its skill and judgment to select contaminant free goods and to also specify certain characteristics of the components of the kits or require testing of those items.

Relying on § 2-316(3)(b), RTB also contends that Halo disclaimed any implied warranty of fitness for a particular purpose upon its acceptance of pre-production samples and the delivered kits. That section provides:

> when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to <u>defects which an examination ought in the circumstances to have revealed to him</u> . . . .

810 ILCS 5/2-316(3)(b) (emphasis added). However, the emphasized language makes clear that latent defects like those Halo has alleged in this case are not precluded by the statute. See <u>Artistic Carton Co. v. Thelamco, Inc.</u>, No. 1:06-CV-316-TS, 2009 WL 3060205, at *6 (N.D. Ind. Sept. 22, 2009) (construing identical U.C.C. provision in Indiana Code). Therefore, Halo has not pleaded circumstances indicating that it disclaimed the implied warranty of fitness for a particular purpose.

RTB argues further that Halo's claim for breach of the implied warranty of merchantibility in Count III fails because Halo has not alleged the ordinary use of the kits and it was disclaimed when Halo approved a pre-production sample. Halo takes issue with this argument, maintaining that it has specifically pleaded that

> 7. During the negotiations, HALO stressed the need for the products to be free of contaminants indicating to RTB what the welcome kits were for and to whom they would ultimately be given. RTB knew that the new patient welcome kits were intended for direct distribution to dialysis patients who, by the nature of their treatment, have an increased susceptibility to infection due to the direct contact with the bloodstream during the filtration process. HALO further informed RTB that it was relying on RTB's expertise that all applicable testing would be done to make sure the products were safe for delivery to the new patients.

The court agrees that Halo has sufficiently alleged the ordinary use of the kits. The cases cited by RTB to support its argument are distinguishable because they did not involve an ordinary purpose description like the one set out above and the goods at issue were complex and without a clear ordinary purpose. See <u>Baldwin v. Star Scientific, Inc.</u>, 78 F. Supp. 3d 724, 741 (N.D. Ill. 2015) (holding that plaintiff failed to allege the ordinary purpose of the 'wonder drug' Anatabloc or why it was unfit for its ordinary purpose); <u>Indus. Hard Chrome, Ltd. v. Hetran, Inc.</u>, 64 F. Supp. 2d 741, 748 (N.D. Ill. 1999) (holding that plaintiffs failed to allege the ordinary purpose of an integrated series of machines called a "Cell"). RTB's argument that Halo pleaded circumstances disclaiming the implied warranty of merchantability fails for the same reason that the identical argument failed with respect to the implied warranty of fitness for a particular purpose.

Lastly, RTB argues that Halo's claim for breach of express warranty in Count I fails because it does not adequately allege that any express warranties arose and that any statements alleged in the complaint that are attributed to RTB are at best "puffing." "To state a claim for breach of express warranty, the buyer must allege that the seller made: (1) an affirmation of fact or promise made to the plaintiff; (2) relating to the goods; (3) which becomes part of the basis for the bargain; and (4) guaranteeing that the goods will conform to the affirmation or promise." Gubala v. CVS Pharmacy, Inc., No. 14 C 9039, 2016 WL 1019794, at *18 (N.D. Ill. Mar. 15, 2016). With regard to the first element which RTB claims is lacking, Halo maintains that it has alleged that "RTB warranted that the prepackaged new patient welcome kits for [Halo's] client passed the requisite safety standard, were in good condition, and were safe for delivery to new dialysis patients." Halo alleged further that the kits did not pass the requisite safety standard, were not in good condition, and were not safe for the patients because they were contaminated with silica, grease, dirt, and mold. This is a sufficient allegation of an affirmation of fact or promise made by RTB to Halo about the kits.

RTB complains that there is no allegation identifying the requisite safety standard other than the testing required under the terms of the purchase order and that there is no allegation that RTB did not conduct that testing. RTB cites no authority requiring that level of detail in the complaint. In any event, it is a fair inference from the allegations that, whatever the requisite safety standard is, kits contaminated with silica, grease, dirt, and mold do not meet it and the required testing would have detected such contamination. The promises allegedly made by RTB to Halo concerning the condition of the kits do not strike the court as "puffing." See Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill. 2d 100, 173 (2005) ("'Puffing' denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined."). However, suffice it to say that Halo has plausibly pleaded promises made by RTB about the kits that have a specific factual meaning and are not just an opinion exaggerating the quality of the kits.

### III. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is granted in part and denied in part. Should plaintiff elect to proceed on a rejection theory of recovery for its breach of contract claim, it is granted leave to filed an amended complaint within 21 days.

Date: 3/24/2016

ENTER:

_____

FREDERICK J. KAPALA

District Judge